IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 18, 2017 Session

## LINDA WIMMER v. CHATTANOOGA-HAMILTON COUNTY HOSPITAL AUTHORITY D/B/A ERLANGER HEALTH SYSTEM

Appeal from the Circuit Court for Hamilton County
No. 14C507     W. Neil Thomas, III, Judge

No. E2017-00352-COA-R3-CV

Linda Wimmer ("Plaintiff") sued Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System ("Erlanger") with regard to an incident in which Plaintiff was hit with an interior door and seriously injured. After a trial without a jury, the Circuit Court for Hamilton County ("the Trial Court") entered its Memorandum and Judgment finding and holding, *inter alia*, there was no evidence that the location of the door constituted a defective design and no evidence that the door itself was defective, and that even if Erlanger had a duty to post a sign or put a glass window in the door, there was no evidence of causation. The Trial Court entered judgment in favor of Erlanger. Plaintiff appeals to this Court. We find and hold that Erlanger was immune from suit pursuant to Tenn. Code Ann. § 29-20-101, *et seq.*, that Plaintiff failed to prove that said immunity was removed, and, in the alternative, that Plaintiff failed to prove causation. We, therefore, affirm the Trial Court's judgment in favor of Erlanger.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed
Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, J., joined, and JOHN W. MCCLARTY, J., filed a separate dissenting opinion.

Marvin B. Berke and Timothy J. Crosby, Chattanooga, Tennessee, for the appellant, Linda Wimmer.

Joshua A. Powers and Hanna L. Burnett, Chattanooga, Tennessee, for the appellee, Chattanooga-Hamilton County Hospital Authority d/b/a Erlanger Health System.

# OPINION

## Background

The accident giving rise to this suit ("the Accident") occurred in October of 2013. Plaintiff was at Erlanger for a doctor's appointment. After her appointment, Plaintiff stood in a lobby area while she waited for her ride. While waiting, Plaintiff was hit and knocked to the ground when an interior door ("the Door"), which opened outward into the lobby area, was opened by an unknown person. Plaintiff filed suit against Erlanger in April of 2014, and the case proceeded to a bench trial in January of 2017.

At trial, Plaintiff testified that she was 71 years old at the time of the Accident and lived in a senior living facility. Prior to the Accident, she was able to walk and drive. Plaintiff stated that she used a cane when "the ground was uneven or whatever, rough terrain, it helped." Plaintiff testified that she saw several doctors at Erlanger for care and treatment including Dr. Ingram, an orthopedic surgeon. On the day of the Accident, Plaintiff was at Erlanger to see Dr. Ingram, whom she had been seeing since April of that year for care and treatment of a fractured arm. Plaintiff stated that on that day, she "felt like [she] was getting better. [She] felt like [her] arm was healing. It was almost healed. It was getting better."

Although Plaintiff was capable of driving, she did not drive to her appointment on the day of the Accident. Instead, she took the senior living van from the senior living facility where she resided.

Plaintiff entered the building that day through the same lobby where the Accident later occurred. After her appointment with Dr. Ingram, Plaintiff returned to this lobby to wait for her ride on the senior living van. Plaintiff testified that she left Dr. Ingram's office just before 11 a.m.

The lobby where Plaintiff waited has outside automatic glass doors and a vestibule area. Plaintiff had waited in the vestibule in the past "in the summer when it was warm." She agreed when asked that in the past she had stood by the brick wall in the vestibule and was out of the way of the path of foot traffic. Plaintiff, however, did not wait in the vestibule area on the day of the Accident. Instead, she waited inside the building. She stated:

> Another thing is, if you waited there [in the vestibule] and it was chilly, the
> doors kept opening for people coming in and out. And the cold air would

2

blow in on you. That's why that day in October, when it was chilly, I was on the inside back behind the . . . I was inside the building.

Plaintiff stated: "The vestibule temperature would have been about 20 degrees lower than being in the building."

Plaintiff was asked if she ever had seen the Door open, and she stated:

No. I didn't even realize there was a door there at that time because I wasn't paying any attention to the fact that there might be a door there, because I didn't think about a fire door or anything like that. I was thinking about what I was going to do when I was better. . . . I was just thinking at that time what I was going to do, if I were getting better, what I could do.

She further stated:

I was getting better, and I was planning on going to see my sister out in Nevada, because she's 78. I'm 74. At the time, we were younger, but my sister's also very ill. She has a lung disorder. And that may be fatal. And I wanted to see her before we both died, you know, because we're the only two family members - - immediately family members - - left.

Plaintiff testified that there was no sign telling her not to stand where she was standing, and that she did not notice a window in the Door. There were no places to sit by the Door. Plaintiff admitted that the Door is a wooden door with a black metal frame surrounded by red brick. She stated, however, that she did not see the Door until after she was hit. Plaintiff admitted when asked that she did not know the Door was there until after she was hit.

Plaintiff was asked if during her past visits to Erlanger she had seen other people standing in the area where she had been standing when the Accident occurred, and she stated: "Yes. People stood there." Plaintiff stated:

It was typical to wait there, not only myself, but there would be other people waiting at times. It wasn't real crowded up together, but there would be - - one or two other people would be standing here, waiting for their rides, because our van wasn't the only one that came up there to pick people up.

Plaintiff was asked why she didn't sit in an available chair away from the Door, and she stated:

3

I could, but I couldn't have seen [the van driver] until he pulled up right in front of the doors, which upset him, because he - - people start blowing their horns at him and cursing him and stuff like that. He had incidents that happened in front of that door when he had to pull up and wait for you. He didn't like it. . . . Well, he couldn't come in the building and say anything. He couldn't leave the van. He'd expect you to see him, and that's why I was standing. . . . And he was coming from the left direction. So I had to see from the left up the driveway, to see him turning into the driveway. And I would start out the door, because he had to put the lift down to put me in the van. You couldn't get in the door of the van. You had to go in the back end of it through a lift.

When asked if she could have seen the senior living van if she had been sitting in a seat away from the Door, Plaintiff stated:

I would say I could probably see out the front door, but you couldn't see the curb where he had to turn in the driveway. But you could probably see a small portion, a portion of the driveway. Maybe. I'd have to - - my walking is very slow. I'm supposed to get around. By the time I got out there, he'd have to be sitting there for a couple minutes.

Plaintiff described the Accident, stating:

I was knocked about halfway across the foyer there and finally fell on my back. And when I fell, I couldn't feel anything from my neck down. I was afraid that I'd been paralyzed, broken my back or something.

And the man was right behind me, and he had on scrubs and he had on the bandana. And I assumed he was an employee of the hospital since he was dressed in scrubs and they were blue.

He bent over and [sic] me and he said, "Are you all right?"

I said, "No. I can't feel anything from my neck down."

He says, "I can't stay with you, but I'll go get help."

And he ran off, going in the direction down the hall. . . . And I lay there for about 15 minutes more and he came running back. He said, "I couldn't find anybody. I'll be back."

4

And he ran off again. In a little while, a lady came down. And he said, "I'll get someone to stay with you."

A lady came down. I assume she was an office worker. And she said, "I'm going to stay with you until the ambulance comes." So she did. She stayed there and talked to me till the ambulance came.

Plaintiff stated that she fractured her left hip. After the Accident, Plaintiff was unable to return to the senior living center, but she instead had to go to the Life Care Center. Plaintiff had surgery in October and in November and also has had physical therapy. She stated that her pain "[n]ever ends." Plaintiff testified that she has pain in her shoulders, back, and neck. She stated:

I can barely walk. And I go through these periods where it seems like I can walk better, and then one morning I'll wake up and can hardly walk. This will go on for weeks, and then I can walk better, and then it will go back to the way it was.

Plaintiff testified that she now uses a walker. She stated:

Both legs give me trouble now, because one leg is shorter than the other. And one arm is - - if I can put my jacket down, if you can see, my arms aren't the same length anymore. This one is shorter than this one.

The parties stipulated that Plaintiff had medical expenses of $125,000.

Clarkson Lee Mason, a practicing engineer, testified for Plaintiff. Mr. Mason testified that he was 75 years old and had been practicing engineering for 47 years. Mr. Mason stated that he has owned his own business for approximately the last 30 years. Mr. Mason is licensed in Tennessee. He stated that he also is licensed in two other states and previously was licensed in six states, but did not renew all of his licenses because he wasn't doing business in those states anymore.

Mr. Mason testified that he visited the site of the Accident and inspected the Door several times. He stated:

Well, it looked just like any other door, you know, but it's not just any other door. And I know that. It's the fire escape. In this case it's the fire escape. It could be any kind of means of escape. It's an escape door.

5

And there's nothing there that really says - - that I can see, that I can see right now, that suggests it is an exit hatch or exit-way. So other than that, it just looked like another office door.

Mr. Mason was asked if he believed that the Door was a dangerous condition, and he stated:

Just by itself sitting there, I didn't, because I wasn't all that acquainted with the situation that had occurred there.

But as you learn more about what occurred, you can see why things could become hazardous, if certain sets of circumstances were to prevail approximately at the same time.

When asked if he had an opinion about whether the Door should have had a sign, Mr. Mason stated:

Yes, I do have an opinion. And I think it's appropriate, very appropriate for any exit door to have a warning to other people who may be casually waiting to - - waiting to walk by it or whatever, to let them know that there's more than likely - - excuse me, the purpose of that door there is to allow people to come out, and so it shouldn't be an unreasonable expectation that somebody would come out, that someone might come out at a high rate of speed when there's not an apparent fire or emergency situation. I'm not sure how you can put up a detector to make that happen. But they need to have an ability to see what's in front of them.

With regard to the necessity for a sign, Mr. Mason further stated:

Well, from my engineering point of view and, I'd like to say, common sense based on my engineering and experience in the business having to do with buildings, you kind of would expect there to be some sort of a warning sign there so that couldn't recur, that action wouldn't recur.

Mr. Mason was asked if someone standing in front of the Door with no sign would know it was an exit door, and he stated: "Only by past experience, having been there often enough to realize that. But there's not distinguishing marks." Mr. Mason stated that in his opinion the cost of such signs is minimal. According to Mr. Mason, there is no way for people to know in the absence of a sign that the Door might open into them. Mr. Mason did not explain his opinion as to why people would not know without a sign telling them that the Door might open into them.

6

When asked if the Door not having a sign was a problem, Mr. Mason stated: "Well, the problem was not so much the sign. The problem was there wasn't any way for her to be seen or for her to see what was happening, and she did get hit and get hurt." He was asked if he had an opinion about whether there should be glass in the Door, and he testified:

> [I]n a situation where we have an injury that has occurred, you need to be able to let whoever is on the inside know there is a falling hazard on the inside. And vice versa; someone on the outside knows or can perceive someone coming through that door and hit them. That may not stop it from happening, but they'll at least have some idea that it's getting ready to happen . . . .

Mr. Mason was asked if it were common to have glass in a fire escape door, and he stated that it was not unheard of or unusual to have a glass panel. Mr. Mason testified that the fire code provides that a door may be replaced in total with a properly rated glass door or that portions of a door may be glass. He stated that the fire code gives dimensions for windows in doors, but does not require windows in doors.

Rodney J. Patton testified at trial. Mr. Patton works for Regions Bank in the corporate security division. He previously worked for the Hamilton County Sheriff's Office and did security at Erlanger as a commissioned police officer. During his time working for Erlanger, Mr. Patton became interim chief of hospital police. Mr. Patton testified that things at the hospital changed and police were outsourced to private security. As a result, he and others have a lawsuit pending against Erlanger. Mr. Patton left Erlanger in late 2010 or early 2011.

Mr. Patton testified that he was familiar with the Door at issue. He testified: "We routinely had incidents that involved individuals, whether it be patients or visitors, that may have been struck by a malfunctioning door or a door at Erlanger." When asked specifically about the Door, Mr. Patton stated:

> That is an odd door. There's a couple of doors in the medical mall that you can be standing there and someone may push that door out and you may not be - - they may not know someone is standing on the other side. There's a couple of doors like that.

Mr. Patton was asked if he ever made reports about doors hitting people while at Erlanger, and he stated: "Routinely, if an individual got hit by a door, that is something that would have went up to the A1 house supervisors at Erlanger."

Michael Roy Baker, the senior director of facilities for Erlanger, testified at trial. He described his role as "oversight of operations of real estate, construction, engineering, and environmental services." Mr. Baker was contacted by risk management on the date of the Accident and told that someone had fallen.

Mr. Baker explained that seating in the lobby where the Accident occurred is some distance from the outside door, and the chairs face toward one another, not toward the outside doors. He stated that the "common waiting areas" are not "designed to see out the door."

James Howard Robinson, Jr., an engineer, testified for Erlanger. Mr. Robinson testified that he is licensed in 46 states including Tennessee. He is board certified as a structural engineer and a forensic engineer. Mr. Robinson was asked what a forensic engineer is, and he stated:

> A forensic engineer in structures and building is an engineer that will look at different systems of a building, wherever there's a failure. Could be in the structural system, could be in the egress system, could be in the mechanical, electrical, any of those types of systems.
>
> But a forensic engineer will evaluate a problem or a failure within one of those systems to determine why it failed and then, most likely, try to determine what can be done to correct it.

Mr. Robinson testified that he was hired to evaluate the area around the Door and determine if there were code violations and if it was code-compliant. Mr. Robinson stated that he visited the site for approximately one hour. He stated that he:

> did a visual review of the area around the door, the area around the entrance and exit to the building itself. And I went inside the stairwell, went up a flight of stairs, came back down, looked at everything inside, took quite a few measurements of what was in there and quite a few photographs.

Mr. Robinson explained that the stairwell behind the Door was "an egress exit for the building" and:

> would be a fire exit out of the building. This is one of the primary egress towers coming out of the building, and that door is the enclosure in addition, of course, to the walls that go all the way around. But that door completes the fire enclosure around the stair tower.

8

He explained that the Door must open outward.

Mr. Robinson testified that the applicable codes, the Standard Building Code, the Standard Fire Code, and the Life Safety Code, require neither signage on the Door nor a glass panel in the Door. Mr. Robinson was asked about dimensions of windows in fire doors, and he stated:

> Typically, in a fire door, it would be approximately two inches wide. That is so that when someone is trying to come to the door, trying to open the door to get out, they can't take their hand - - as you would come down the stairs and you're running and you push that door open, you don't want their hand to go through the glass panel. That is extremely dangerous. So you want that to be very narrow. Typically, it is two inches or less.

Mr. Robinson stated that one would have "a very small field of vision looking through" such a window. When questioned further, Mr. Robinson agreed that no code requires such windows to be two inches. He stated:

> It could be 10 inches. . . . [I]t can be as large as you want to make it. The designers tend to and try to make it as narrow as possible so they don't create injuries of people's hands getting cut and arms getting cut. We've had many injuries because those windows were too wide. So today the standard is to make them very narrow, as I said earlier, so that a person cannot shove their hand through that window.

He further stated that although windows such as these are made to resist breaking, they are not impossible to break.

He also explained that the field of view from a fire door window would be limited and stated:

> [T]he purpose of putting windows in such doors is not to be able to see people. The purpose is to see whether there's a fire or smoke on the other side of that door, because if you get - - if you are coming down and look through that glass and you see fire or smoke, you're supposed to know "we do not open this door."

Mr. Robinson agreed that the purpose of the Door is it's a fire door, and he stated: "It is the enclosure that keeps the stair tower rated as a fire enclosure. . . . The purpose is to

9

maintain the fire enclosure of that stair tower so that you have an enclosed area that is protected from the fire if there is a fire outside at that level."

Mr. Robinson testified that the Door was not camouflaged but instead "stood out quite well in fact. You've got the light tan door with a dark frame wrapped around it and the brick panel. So there's quite a bit of contrast." He opined that the Door is not a dangerous condition, but agreed when asked that it was possible for it to be a dangerous condition even if it were code compliant.

After trial, the Trial Court entered its Memorandum and Judgment on February 2, 2017, finding and holding, *inter alia*:

> On October 7, 2013, Plaintiff, Linda Wimmer (hereinafter "Mrs. Wimmer"), visited her doctor at Erlanger. Mrs. Wimmer, who is presently age 74, was 71 at the time of the accident. At the time of the accident, she was living at a senior assisted living facility on Highway 58 and was transported to the hospital for her visit by a van. After the visit with her doctor, she waited for the van in the lobby area of the hospital, as she had commonly done. The events of the accident are shown on a video, which was introduced as Exhibit 2, and depicted an open area in front of the facility with two sets of sliding doors. Mrs. Wimmer was waiting on the inside of the inside doors with a door from a stairwell to her right. That door opened outward into the lobby area. While waiting, she was hit by the door and knocked down when a man in scrubs opened the door in somewhat of a hurry. The man in scrubs bent over her and asked her if she was alright, and she said no. He ran off to get help, came back with help about 15 minutes later and then left. Mrs. Wimmer was taken by ambulance from the front door of Erlanger to the emergency room at Erlanger. The video of the accident showed that there was no place to sit next to the door, and Mrs. Wimmer had seen others standing there. She candidly testified that she "never realized there was a door there" until the accident, having not paid any attention to it. She testified that she stood by the door because she wanted to make sure that she saw the van when it arrived, there having been some tendency on the part of the van driver to drive off if he saw no one. She did not stand in the area between the sliding doors because it was cold that morning. It was undisputed that there was no sign on the door; nor was there any aperture in the door through which someone on either side of the door could see.

\* \* \*

10

Clarkson Lee Mason testified as an expert on behalf of Mrs. Wimmer, and he was qualified to so testify. Mr. Mason is a professional engineer and architectural consultant. On August 14, 2016, he inspected the door from both sides and also viewed the video of the accident. Mr. Mason had no opinion as to whether the door itself was dangerous. He did testify that he believed that a sign either on the outside or the inside of the door was necessary "based on common sense and experience." He also testified that he felt that a glass window in the door was necessary to let someone on the inside of the door know that a person was outside and vice versa. While he said that such an opening would not have prevented the accident from happening, he testified it may have lessened the injury, but he did not say how. On cross-examination, he testified that the Southern Building Code does not require a window in the door, nor does the Life-Safety Code. He could not say more likely than not that the Plaintiff would have seen a sign or that the sign would have prevented the accident. He felt that the real problem was that the lack of a window made it impossible for someone coming out the door to see if someone was in front of the door. He offered no testimony on the issue of whether the absence of a sign or the absence of a window was the cause of the accident. On cross-examination, he did rely upon materials he had obtained the previous evening with respect to the requirement that "exit" signs be visible and that exit areas be free and unobstructed. . . . This testimony, however, is not applicable to this accident, because the door in question is posted with an exit sign, and there is no obstruction to the exit. The testimony of Mr. Mason cannot be the basis of a finding of liability.

James Robinson testified as a civil engineer with Bachelor's and Master's Degrees from Georgia Tech. He is familiar with the Building Code for the building as well as the Fire Code and Life-Safety Code. He testified that no code requires signage or a glass panel and that even if signs or glass panels had been there, the outcome would most likely not have been affected.

\* \* \*

The issues in this case really boil down to causation. There has been no evidence that the location of the door constituted a defective design, nor is there evidence that the door itself is defective. Consequently, the only defect upon which the Plaintiff can rely is the evidence that there should have been a sign or a glass window in the door. Even assuming that there was such a duty, the question then becomes whether there has been

11

evidence of causation, namely, whether the accident would have been avoided even with the existence of a sign or a glass window. The testimony of Mr. Mason was only that the door opened in such a way as to not cause a warning to the Plaintiff, not that the warning would have made it more likely than not that the accident would not have occurred. In fact, the Plaintiff herself testified that she would not likely have seen either a sign or a glass opening, since she testified she was not even aware the door was there until after the accident. Thus, the only expert testimony to support a finding of liability is that the result was only remotely possible. This the Court cannot do.

Had liability been established in this case against Erlanger, however, the Court has no doubt but that an award would have resulted in the statutory maximum against Erlanger or $250,000, because of the size of the medical expenses and the injury involved. Because liability was not established, however, no damages will be awarded. For the foregoing reasons, judgment will be entered in favor of Erlanger.

Plaintiff appeals to this Court.

## Discussion

Although not stated exactly as such, Plaintiff raises one issue on appeal: whether the Trial Court erred in finding that Plaintiff failed to prove causation. Erlanger raises additional issues, which we restate as: 1) whether the Trial Court erred in failing to find that Erlanger was immune from suit pursuant to Tenn. Code Ann. § 29-20-101, *et seq.*; 2) whether the Trial Court erred in finding that Erlanger had a duty; and, 3) whether Plaintiff was at least 50% at fault for her injuries.

Our review is de novo upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). A trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Kelly v. Kelly*, 445 S.W.3d at 692.

As it is dispositive, we first will address Erlanger's issue regarding whether the Trial Court erred in failing to find that Erlanger was immune from suit pursuant to Tenn. Code Ann. § 29-20-101, *et seq.*, the Tennessee Governmental Tort Liability Act ("GTLA"). We note that while no specific proof was presented at trial regarding whether Erlanger was a governmental entity pursuant to the GTLA at the time of the Accident, and the Trial Court made no specific findings regarding whether Erlanger was or was not a

12

governmental entity entitled to immunity under the GTLA, the parties and the Trial Court clearly appear to have agreed that Erlanger was a governmental entity and that the GTLA applied to this suit, and the case was tried as such. Erlanger asserted in its answer to Plaintiff's complaint that it was a governmental entity and that the GTLA applied to this case. At trial during opening statements, Plaintiff's attorney stated: "The real problem that I foresee is that - - unfortunate that the hospital only has the governmental limits," a clear reference to the statutory limits provided in the GTLA. After the close of proof at trial, Erlanger's attorney raised a question with regard to the statutory limit under the GTLA and how damages would be calculated if there were a finding of comparative fault, and a brief discussion ensued. The Trial Court also made reference in its judgment to the fact that if liability had been established an award would have been subject to the statutory maximum, another clear reference to the statutory maximum contained in the GTLA. Given the tacit agreement that Erlanger was a governmental entity and that the GTLA applied to this suit, Erlanger was immune from suit unless Plaintiff proved that immunity was removed pursuant to the GTLA.

We, thus, consider whether Erlanger's immunity was removed. Erlanger's immunity under the GTLA could be removed pursuant to section 29-20-204 of the GTLA, which provides:

> **29-20-204. Removal of immunity for injury from dangerous structures – Exception – Notice required.**
>
> (a) Immunity from suit of a governmental entity is removed for any injury caused by the dangerous or defective condition of any public building, structure, dam, reservoir or other public improvement owned and controlled by such governmental entity.
> (b) Immunity is not removed for latent defective conditions, nor shall this section apply unless constructive and/or actual notice to the governmental entity of such condition be alleged and proved in addition to the procedural notice required by § 29-20-302 [repealed].

Tenn. Code Ann. § 29-20-204 (2012).

In its judgment, the Trial Court specifically found that: "There has been no evidence that the location of the door constituted a defective design, nor is there evidence that the door itself is defective." The evidence in the record on appeal does not preponderate against these findings. Furthermore, the record on appeal is devoid of evidence showing that if the Door were considered a latent defective condition that Erlanger had constructive or actual notice of the defect. The record on appeal contains no evidence of any accidents or incidents involving the Door other than the Accident at

13

issue. Nor did Plaintiff produce any other evidence showing constructive or actual notice of a defect. As Plaintiff failed to prove that the Door constituted a dangerous or defective condition, and also failed to prove that Erlanger had actual or constructive notice that the Door constituted a latent defect, immunity from suit was not removed by Tenn. Code Ann. § 29-20-204.

Erlanger's immunity under the GTLA also could have been removed pursuant to either Tenn. Code Ann. § 29-20-202 or Tenn. Code Ann. § 29-20-205. In pertinent part, § 29-20-202 provides for removal of immunity for "negligent operation by any employee of . . . other equipment while in the scope of employment." Tenn. Code Ann. § 29-20-202 (2012). The pertinent part of § 29-20-205 provides that immunity "is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment . . . ," except in specific circumstances not applicable to the instant case. Tenn. Code Ann. § 29-20-205 (2012).

A careful and thorough review of the record on appeal shows that Plaintiff failed to prove any action by an employee of Erlanger acting within the course and scope of employment. Although Plaintiff testified that she believed that the person who opened the Door was an Erlanger employee because he was wearing scrubs, this assertion is simply speculation. The identity of the person who opened the Door was not proven at trial, and it would be pure speculation to assume that person was an Erlanger employee acting within the scope of his employment. The record on appeal is devoid of evidence supporting a finding of removal of immunity pursuant to either Tenn. Code Ann. § 29-20-202 or Tenn. Code Ann. § 29-20-205.

Plaintiff failed to prove that Erlanger's immunity was removed under the GTLA. Given this, the inquiry should have ended and Erlanger found immune from suit. The Trial Court, however, continued its analysis and found that Plaintiff had not proven causation. Given this, we will consider Plaintiff's issue regarding whether the Trial Court erred in finding that Plaintiff failed to prove causation.

Specifically, with regard to causation the Trial Court found and held:

The issues in this case really boil down to causation. There has been no evidence that the location of the door constituted a defective design, nor is there evidence that the door itself is defective. Consequently, the only defect upon which the Plaintiff can rely is the evidence that there should have been a sign or a glass window in the door. Even assuming that there was such a duty, the question then becomes whether there has been evidence of causation, namely, whether the accident would have been avoided even with the existence of a sign or a glass window. The

14

testimony of Mr. Mason was only that the door opened in such a way as to not cause a warning to the Plaintiff, not that the warning would have made it more likely than not that the accident would not have occurred. In fact, the Plaintiff herself testified that she would not likely have seen either a sign or a glass opening, since she testified she was not even aware the door was there until after the accident. Thus, the only expert testimony to support a finding of liability is that the result was only remotely possible. This the Court cannot do.

The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings made by the Trial Court. Given these findings, we find no error in the Trial Court's reaching the conclusion that Plaintiff failed to prove causation even though it was unnecessary to reach a conclusion as to causation.

We affirm the Trial Court's February 2, 2017 judgment. Our resolution of the two issues discussed above pretermits the necessity of considering Erlanger's remaining two issues.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Linda Wimmer, and her surety.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

15